# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 98 C 0814 | DATE | SEP 18 2000 |
| CASE TITLE | Fred J. Hart v. Schering-Plough Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, defendant SPAHC is found not liable for $90,000, less severance already paid, for breach of contract. As the defendant is prevailing, SPAHC is not liable under Ch. 705 ILCS § 225/1 for plaintiff's costs including attorney's fees. Enter Judgment for the DEFENDANT.
There being no further matters before this Court, this action is closed.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

No notices required, advised in open court.

No notices required.

Notices mailed by judge's staff.

Notified counsel by telephone.

X Docketing to mail notices.

X Mail AO 450 form.

Copy to judge/magistrate judge.

dc(lc)  courtroom deputy's initials

number of notices

SEP 20 2000 date docketed

ED-7
FILED FOR DOCKETING
00 SEP 19 PM 1:46

date mailed notice

Date/time received in central Clerk's Office   mailing deputy initials

Document Number 39

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Fred J. Hart, | ) |
| Plaintiff, | ) ) ) Case No. 98 C 0814 |
| v. | ) ) HONORABLE DAVID H. COAR |
| Schering-Plough Corporation, | ) ) |
| Defendant. | ) ) |

DOCKETED
SEP 2 0 2000

## MEMORANDUM OPINION AND ORDER

Before this court is plaintiff Fred J. Hart ("plaintiff" or "Hart") complaint for breach of contract against defendant Schering-Plough Animal Health Corporation ("defendant" or "SPAHC"). After conducting a bench trial on January 25, 1999 and reviewing the admitted exhibits, for the following reasons this court finds for the defendant.

### Statement of Facts

Plaintiff brought this action against SPAHC for payment of obligations under the termination provisions of a foreign assignment agreement executed on November 11, 1993 between plaintiff and SPAHC. (Pl.'s Complaint, pg. 2). From 1987 to December 31, 1993, Hart worked for Pitman-Moore[1] Ltd., Australia, as a research scientist in variety of areas, all in animal

---

[1] The defendant company was originally named Pitman-Moore. The defendant then changed its name to Mallinckrodt Veterinary, Inc. in March of 1994. Mallinckrodt Veterinary was purchased by Schering-Plough Animal Health Corporation (SPAHC) in July of 1997. Thus SPAHC is the defendant in this case. (Memorandum Opinion and Order, Nov. 25, 1998, pg. 1). In this opinion, the court will refer to Hart's employer by Pitman-Moore, Mallinckrodt, and Schering-Plough, depending on the year.

1

health care. Hart did not have a written agreement while working for Pitman-Moore in Australia.. Hart's position in Australia was eliminated, and he was terminated from Pitman-Moore Ltd. R& D, Australia, on December 31, 1993. (Statement of Uncontested Facts, ¶¶ 1-5).

Due to the centralization of Pitman-Moore's research and development activities in Mundelein, Illinois, Hart came to the United States from Australia to work on a temporary foreign assignment in Mundelein as a Senior Research Scientist for Pitman-Moore. (Statement of Uncontested Facts, ¶ 6). Accordingly, Beverly Hayes, Vice-President of Human Resources of Pitman-Moore Inc., sent Hart on October 1, 1993, a foreign assignment agreement which set forth the terms and conditions of Hart's temporary assignment. (Statement of Uncontested Facts, ¶ 7). Hart's foreign assignment agreement's included, in part, provisions for a yearly salary, a housing allowance, an automobile allowance, and a cost of living allowance. (Statement of Uncontested Facts, ¶ 8). The termination provision of the agreement provided the following:

> Should your employment be involuntarily terminated by Pitman-Moore, Inc. other than for cause as defined in the Policy Manual, or there is no assignment available in Australia at the end of your twelve (12) month assignment, the Company will provide you with a severance payment of one (1) year's salary in effect at the time of termination. (Statement of Uncontested Facts, ¶ 9).
>
> In the event that you are terminated while on foreign assignment, the Company will provide return transportation, by business class, for you. Reasonable personal effects will be returned to your point of origin in Australia, which is defined as your place of employment with the Company prior to accepting the assignment. The cost of such transportation must occur within one (1) month after the effective date of termination. Should you choose not to exercise the option of transportation above, no payment will be made in lieu of this privilege. (Pl.'s Trial Brief, pg. 1).

The agreement explicitly stated that it was not an employment contract. (Dft.'s Trial Ex. 1). The cover letter accompanying the agreement stated:

2

> This letter confirms our mutual understanding of the terms and conditions applying to your assignment to the United States . . . The terms and conditions outlined in this letter will be in effect for the period of this assignment, which is twelve (12) months initially at which time the Company has the option to extend it for an additional six (6) months that it was a 12-month assignment that could be increased by additional 6 months . . .
>
> When you return to Australia at the end of this assignment, you will stop receiving any special allowances provided under the Company's Inpatriate Compensation Program. (Dft.'s Trial Ex. 1).

According to the foreign assignment agreement and the cover letter, Hart's assignment could last as long as 18 months, from January 1, 1994 through at late as June 30, 1995. (Statement of Uncontested Facts, ¶¶ 9,12). Hart signed the foreign assignment agreement on November 11, 1993. (Statement of Uncontested Facts, ¶ 10). At trial Hayes testified that she had several conversations with Hart regarding the terms and conditions of the foreign assignment agreement in October 1993. She explained that the negotiations revolved around salary and benefits. At that time Hayes explained that the assignment was for a period of 12 months and could be extended by an additional 6 months.

On June 30, 1995, the end of the 18-month period, Hart stopped receiving the housing subsidy and car allowance. (Statement of Uncontested Facts, ¶¶ 15-18). He simultaneously received a significant salary increase. In addition, Hart testified that on June 30, 1995, he voluntarily entered into a U.S. Permanent Residency agreement with Mallinckrodt in which Mallinckrodt agreed to pay for Hart to receive a green card and corresponding permanent residency status.. Hart's immigration status changed from that of a foreign citizen with a temporary visa to a permanent resident. (Statement of Uncontested Facts, ¶ 23). Hayes testified that the terms of Hart's visa required that in the event that Hart was no longer employed by Mallinckrodt he would be required to return to Australia within 30 days. Hart agreed that unlike

3

a temporary visa holder, a permanent resident has the option of working for any employer located in the United States and may apply for U.S. Citizenship and that permanent residency status is valid for ten years. Under terms of his Permanent Residency Agreement with Mallinckrodt, if Hart voluntarily left Mallinckrodt within three years of initiating the process for permanent residency, he was required to reimburse the company for costs and expenses related to obtaining permanent residency status for him. (Dft.'s Trial Ex. 1).

After the initial 18-month period (12-month contract term plus 6-month extension), Hart testified that his work in the Mundelein facility continued to include the same tasks and duties as those prior to June 30, 1995. Hart explained that his goal remained the registration of the products he had been developing since his arrival.

SPAHC acquired Mallinckrodt on July 1, 1997. In acquiring Mallinckrodt, SPAHC decided to close the Mundelein, Illinois headquarters of Mallinckrodt, resulting in the termination of approximately fifty-three research department employees, including Hart. (Uncontested Statement of Facts, ¶¶ 27, 29). Hart's employment was terminated effective September 9, 1997. (Uncontested Statement of Facts, ¶ 32). Upon termination, Hart received $17,463.38 in severance pay. (Uncontested Statement of Facts, ¶ 33). Hart testified that he returned to Australia in November 1997, approximately two months after his termination.

SPAHC refused to recognize any obligation to Hart under the foreign assignment agreement, including severance pay of one year's salary and business class airfare back to Australia. (Pl.'s Complaint, pg. 2).

4

## Analysis

Hart brings this case to compel recovery from SPAHC under the termination provision of the foreign assignment agreement. SPAHC argues that extrinsic evidence establishes that the foreign assignment agreement terminated on June 30, 1995 and therefore, SPAHC is not obligated to perform under the terms of that agreement by providing either severance pay equal to one year's salary or return business class airfare to Australia. (Dft.'s Motion for Summary Judgment, pgs. 1-2). SPAHC's argument is the following: after July 30, 1995, Hart worked under new and different terms and conditions than those set forth in the foreign assignment agreement. (Dft.'s Motion for Summary Judgment, pgs. 11-13). His allowances and benefits ceased, and he received a 38.9% increase in salary. In addition, Hart voluntarily entered into a Permanent Residency Agreement with Mallinckrodt providing him several more options with regard to his ability to work in the U.S.. Hart has not shown that these drastic changes were merely oral modifications to the renewed terms of the original foreign assignment agreement. Hart also has not demonstrated that the termination provision of the foreign assignment agreement was incorporated into terms he accepted for his employment from July 1, 1995 to September 7, 1997. SPAHC did not breach a contract with regard to the terms in the original foreign assignment agreement, and therefore SPAHC is not liable to Hart for either severance pay of one year's salary or return business class airfare to Australia.

Hart has two main arguments.[2] First, he asserts, the agreement was intended to survive

---

[2] In addition, Hart makes a third argument in response to defendant's claim that Hart's return to Australia past the one month period renders Hart ineligible for the benefits under the severance provision. (Pl.'s Trial Brief, pg. 1).

5

for the period of the plaintiff's assignment in U.S., since the agreement did not limit the number of extensions possible. (Pl.'s Motion for Partial Summary Judgment, pg. 2). Second, Hart contends that no other agreement or contract was negotiated that replaces the original assignment agreement, and thus the terms of that agreement were renewed as soon as Hart continued to work past the 18-month period. (Pl.'s Motion for Partial Summary Judgment, pg. 3).

In the state of Illinois, an action for a breach of contract requires four elements: 1) the existence of a valid and enforceable contract, 2) the breach of the contract by the defendant, 3) performance of the contract by the plaintiff, and 4) a resulting injury to the plaintiff. <u>Allstate Insurance Co. v. Winnebago County Fair Association, Inc.</u>, 131 Ill. App. 3d 225, 233 (1985); <u>Thilman & Co. v. Esposito</u>, 87 Ill. App. 3d 289, 296 (1980). The issue before the court is whether SPAHC's termination of the plaintiff constituted a material breach or an intent to materially breach a valid and enforceable contract of employment between SPAHC and the plaintiff.

The first step in interpreting the original contract is to determine the parties' intent to contract. <u>InRe Doyle</u>, 144 Ill.2d 451 (1991). Upon a determination by the court that the language of an agreement is ambiguous and therefore susceptible to more than one meaning, parol evidence is admissible to determine the parties intent. <u>Quake Construction, Inc. v. American Airlines</u>, 141 Ill. 2d 281, 288 (1990); <u>In Re Bartlett v. Illinois National Bank of Springfield</u>, 138 Ill. App. 3d 102, 105 (1985). This Court determined that language of the

---

Plaintiff suggests that defendant's breach of agreement, by a letter sent on July 7, 1997, excused plaintiffs failure to incur transportation and shipping charges within the stated one month period. (Pl.'s Trial Brief, pg 1). However, since this Court has found that no such terms existed past June 30, 1995, there is no reason to address the plaintiff's anticipatory breach of contract issue.

foreign assignment agreement was in fact ambiguous with regard to duration and parol evidence was admissible to determine the intent of the parties regarding the duration of the agreement. (Memorandum Opinion and Order, Nov. 25, 1998, pg. 7). The following is a ruling based on parol evidence presented to the Court on January 25, 1999.

In Illinois, when an employee who is party to an contract for an express amount of time continues the employment after the term has expired there is a presumption that the original contract has continued under the same terms and for the same time period. Foster v. Springfield Clinic, 88 Ill. App. 3d. 459, 463 (1980). In this case, the original foreign assignment agreement designated that the terms and conditions of Hart's assignment at the Mundelein plant would "be in effect for the period of twelve (12) months initially at which time the Company [had] the option to extend it for an additional six (6) months." (Dft.'s Trial Ex.1). On June 30, 1995, the end of the 18-month period, Hart continued to work in the same capacity and continued towards his initial goal of developing and registering specific products.

The presumption of the continuation of an employment contract, however, may be rebutted when there is evidence that the parties were negotiating a new contract or the terms and conditions of the contract had changed. Consolidated Bearings, Co. v. Ehret-Krohn Corp., 913 F.2d 1224, 1230 (7th Cir. 1990); Foster, 88 Ill. App. 3d at 463. In this case, despite the fact that Hart's duties, job description, and location remained the same, the arrival of the end of the delineated 18-month period brought several drastic changes. Many of the terms and conditions of his initial contract were altered. For example, on June 30, 1995 Hart stopped receiving housing, car, and cost of living allowances and simultaneously received a substantial increase in his salary. In addition, during the 18 months prior to June 30, 1995, the Hart relied on a

7

temporary visa which allows foreign citizens to legitimately reside in the U.S. as long as they are employed by the employer who sponsored them, in this case Mallinckrodt. The terms of Hart's visa required that in the event that Hart was no longer employed by Mallinckrodt he would be required to return to Australia within 30 days. On June 30, 1995, Hart entered into a U.S. Permanent Residency Agreement with Mallinckrodt, in which Mallinckrodt agreed to pay for Hart to receive a green card and corresponding permanent residency status. Furthermore, Hart agreed to reimburse Mallinckrodt for any expenses if he chose to voluntarily leave his employment with the company within three years of initiating permanent residency status. As a permanent resident, Hart gained the option of being able to work for any employer in the U.S. and the option of becoming a U.S. citizen. Hart's voluntary acceptance of these alterations in income and immigration status are sufficient to rebut the presumption of a renewed agreement.

The plaintiff argues that these changes were simply modifications to the foreign assignment agreement and that they were neither negotiated for by the plaintiff nor presented as a new employment agreement. Negotiations, however, are only evidence that a party is on notice that the contract will not be renewed. Consolidated Bearings, 913 F.2d at 1230. In this case, the manifest weight of the evidence demonstrates that Hart agreed to alternative terms of employment that affected not only the amount and structure of his salary but also his status as an employee of foreign citizenship, who no longer had to leave the United States at the request of Mallinckrodt. The new terms clearly demonstrated an intent to supply Hart with an employee status that was more similar to the other U.S. employees working at the Mundelein plant precisely at the time when his foreign assignment agreement drew to an end.

In support of his argument, the plaintiff asserts that "a change in the amount of the employee's compensation does not show that the continuation of the employment was pursuant to a new agreement." (Pl.'s Motion For Summary Judgment, pg. 6; 27 Am.Jur.2d §31). In this case, however, there was not only a change in the amount of compensation but also a change in the structure of the compensation. In addition, as a permanent resident, the plaintiff was no longer a "temporary resident" in the eyes of the company. Finally, the fact that all of these changes occurred around the time of June 30, 1995, the deadline for the original foreign assignment agreement is certainly no accident. Mallinckrodt obviously contemplated the expiration of the plaintiff's visa and the terms of his agreement and presented him with alternative employment terms, which Hart accepted. Consequently, the evidence demonstrates that the plaintiff and the defendant were operating under new terms and conditions. Therefore, the original foreign assignment agreement did not continue past June 30, 1995.

Finally, the intent of SPAHC and the plaintiff is not negated by the fact that SPAHC did not make an explicit statement was not made to the plaintiff explaining that the new terms were in fact replacing the original foreign assignment agreement. In Thorsen v. Hansen, 18 Ill.App.2d 1 (1958), an Illinois Appellate Court found that a subcontractor who signed a written contract for the completion of certain construction but subsequently agreed orally to work for a different amount of money that emanate from different sources, in effect agreed to new contractual terms. At no time did the defendant in Hansen state that the new terms and the absence of a duration provision were replacing the written agreement. The court, however, concluded that the evidence would not sustain the plaintiff's contention that the written contract

9

had only been modified. Id. at 1. Similarly in this case, the fact that Mallinckrodt did not explicitly announce that the new terms were replacing the original foreign assignment agreement does not sustain Hart's contention that such alterations merely were modification to the agreement.

## Conclusion

For the foregoing reasons, defendant SPAHC is found not liable for $90,000, less severance already paid, for breach of contract with Fred J. Hart. As the defendant is prevailing, SPAHC is not liable under Ch. 705 ILCS §225/1 for plaintiff's costs including attorney's fees. Enter Judgment for DEFENDANT.

Enter: *[signature]*

David H. Coar

United States District Judge

Dated: **SEP 18 2000**